FILED
2013 Sep-30  AM 09:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN  DIVISION

| | | |
|---|---|---|
| **JEFFERSON COUNTY BOARD OF EDUCATION, an agency of the State of Alabama** | ] ] ] | |
| | ] | |
| **Plaintiff,** | ] | |
| **v.** | ] | **CV-12-BE-2324-S** |
| | ] | |
| **LOLITA S., individually and as parent, guardian, next friend and legal representative of M.S., a minor,** | ] ] ] ] | |
| | ] | |
| **Defendant** | | |

### <u>MEMORANDUM OPINION</u>

This matter, a cross appeal from an administrative due process hearing Decision issued pursuant to the Individual with Disabilities Education Act ("IDEA") and the Alabama Exceptional Child Education Act, is before the court on two motions: "Defendant/Counter-Plaintiff's Motion for Judgment on the 'Appropriate Education' Issue" (doc. 16) and "The Jefferson County Board of Education's Motion for Summary Judgment (Judgment on the Record) on the Independent Educational Evaluation Issue" (doc. 30).  Both of these motions have received thorough briefing.

For the reasons stated in this Memorandum Opinion, the court FINDS as follows:  that, regarding the "Appropriate Education" issue, Lolita S.'s motion is due to be GRANTED IN PART and DENIED IN PART - the hearing officer's Decision is due to be REVERSED and REMANDED as to areas of reading and transition skills and AFFIRMED as to the other items challenged; and that, regarding the "Independent Educational Evaluation" issue, the Jefferson County Board of Education's motion is due to be DENIED - the hearing officer's Decision on this issue is due to be AFFIRMED.

## I.  PROCEDURAL BACKGROUND and OVERVIEW OF THE IDEA

This case represents a dispute between a parent of a child eligible for special education and the Board of Education responsible to provide that child's special education program.  The parties disagree about whether the Board has provided an appropriate education for the child and whether the Board must pay for an independent educational evaluation of the child.

### A.  The IDEA

The Plaintiff and Counterclaim Defendant, the Jefferson County Board of Education, is the Alabama agency with the authority and responsibility to provide public education services to school-age residents located within the Jefferson County School District. The Board must abide by requirements , including those in the IDEA and the Alabama Exceptional Child Education Act. The Individual with Disabilities Education Act, ("IDEA") provides federal assistance to states that provide a free and appropriate education ("FAPE") to children with disabilities by offering each eligible student special education and related services under an individualized education program (IEP).  20 U.S.C. § 1412 (a)(1)(A).   In compliance with this Act, states must identify children in need of special education services.  *Id.* § 1412(a)(3)(A).  Having identified a child as disabled, the state must develop an IEP that complies with the Act. *Id.* § 1412(a)(4). The Act's procedures include the requirements that the school and parent(s) develop the IEP together and that the IEP be reviewed at least annually.  The IEP must be "reasonably calculated to enable the child to receive educational benefits." *See Draper v. Atlanta Indep. Sch. Sys.,* 518 F.3d 1274, 1279 (11th Cir. 2008).  And if a parent of the disabled child disagrees with the appropriateness of the IEP, and informal review procedures fail, the parent has the right to resolve the disagreement through an impartial due process hearing conducted by an administrative law judge.  Following a Decision as a result of the hearing, the parents or the educational agency each has the right to

challenge the Decision through an appeal brought in either state or federal court.  20 U.S.C. § 1415(i)(2)(A); *see, e.g., CP v. Leon Cnty. Sch. Bd.,* 483 F.3d 1151, 1153 (11th Cir. 2006).

###### B. Procedural History of this Case

The Defendant and Counter-Plaintiff, Lolita S., is a resident of Jefferson County and is the parent and legal guardian of M.S., who is a minor and a male student in the Jefferson County School System.  No dispute exists that M.S. is a student with disabilities eligible to receive special education services.

Lolita S. requested a due process hearing, claiming that the Board had violated her son's right to "timely and comprehensive evaluations [and] the provision for a free appropriate public education ["FAPE"] in the least restrictive environment, including the provision of related services and appropriate individualized academic instruction."  As a result of the Board's alleged violation, Lolita S. contended that M.S. failed "to make reasonable progress in numerous areas." The relief Lolita S. sought included, among other things, reimbursement for her out-of-pocket expenses, such as attorneys fees and the fee for independent educational evaluations ("IEE").  (R. 1513).

The Board claims that the IEE conducted on M.S.'s behalf by Dr. Joseph Ackerson was not a true IEE, but rather, was "expert" testimony procured for the purpose of supporting Lolita S.'s position in the litigation.

The parties participated in a due process hearing, and the administrative hearing officer subsequently issued a Decision dated May 9, 2012.  In that Decision, the hearing officer ruled in favor of the Board on the "appropriate education" issue, finding that the Board had met its programmatic obligations to M.S. under the law and that the Board had not denied M.S. his right to a FAPE.  However, the hearing officer also ruled in favor of Lolita S. in part, finding that she

3

was due to be reimbursed for the cost of the IEE by Dr. Ackerson. (R. 1922-23).

On June 29, 2012, the Board filed the appeal to this court, challenging the ruling in favor of Lolita S. on the IEE issue. (Doc. 1).  In her Answer, Lolita S., individually and on behalf of her son, M.S., filed a counter-claim against the Board in the nature of a cross-appeal, challenging the ruling in favor of the Board on the "appropriate education" issue, and she also contests the Board's failure to assure appropriate due process procedures that the IDEA requires. Lolita S. requests not only compensatory damages and attorneys fees but also declaratory relief and a permanent injunction to prevent the Board from committing the challenged educational practices. These cross motions request only rulings on the substantive matters; any issues regarding attorneys fees are "on hold" and will be addressed, if they remain viable, after the court rules on the substantive matters.

One of the two issues addressed in this appeal – the "Independent Educational Evaluation" issue was addressed in a case before the Eleventh Circuit Court of Appeals, *Phillip C. v Jefferson Cnty. Bd. of Educ.,* 701 F.3d 691 (11th Cir. 2012), which was pending at the time the instant case was appealed to this court.  The court ordered separate briefing on the two issues, allowing briefing on the "Independent Educational Evaluation" issue to be delayed until after the Eleventh Circuit ruling.  (Doc. 11).  The Eleventh Circuit entered a decision on the *Phillip C.* case at the end of November of 2012.  Accordingly, briefing on the second issue began in March of 2013, and both issues are now under submission.

## II.  FACTS

M.S., the student who is the subject of this appeal, was sixteen years old at the time of the due process hearing and seventeen years old at the time of the briefing.  M.S. has several siblings and half-siblings, and at least two of them are disabled and were receiving special education

4

services during the period at issue.  M.S. lives with his mother, and his father is not a strong presence in his life.

The 2,000 page Record paints widely divergent pictures about M.S.'s personality and capabilities.  All parties agree that he speaks clearly and distinctly, but from that agreed starting point, the disputes abound. According to M.S.'s mother, he is shy, socially withdrawn, and capable of pursing the regular, academic diploma track, but she acknowledges that he cannot write in cursive, has difficulty making change, and has yet to pass his driving test despite numerous attempts.  The doctor she hired to evaluate M.S. opines that he is mildly depressed, that the occupational diploma track is a better fit for him, and that he is not likely to obtain his driver's license anytime soon or live independently.  Teachers draw a picture of a generally happy, social young man who is capable of performing the academic work but who lacks interest and motivation.  This court has the unenviable task of combining the sometimes conflicting pictures drawn from the 2,000 pages of words, applying the law to those pictures, and determining whether the resulting answer is to affirm or to reverse or some combination.

Some information about M.S. is objective, but even the objective facts are not always consistent.  Take, for example, his IQ scores.  Based on the Standard Binet 5th edition testing that the Jefferson County Board administered to M.S., his Full Scale IQ score is 74 with a score of 100 being average, placing him in the "borderline" or "slow learner" range of intellectual functioning.  His standard scores on both the Nonverbal IQ – 74, and the Verbal IQ – 77, also fall into the borderline/slow learner intelligence range.   Based on the WISC-IV IQ testing administered by Dr. Joseph Ackerson, a neuropsychologist that Lolita S. hired to evaluate her son, M.S. has a Full Scale IQ of  66, which generally reflects an intellectual disability.

*Early Academic History*

M.S.'s early academic history reflects a lack of consistency in his school environment; he attended five different Birmingham Schools during the period from 2002-2008.  Further, his academic results appeared uneven; his third grade ARMT (Alabama Reading and Mathematics Test) reflected scores that "met standard" for both reading and math, but testimony also indicated that he had failed either second or third grade.  During the 2007-2008 year, the year before he began attending Jefferson County schools, he attended sixth grade in a "regular" – i.e., not "special ed" – class at Putnam Middle School, and received passing grades with tutoring assistance.

*2008-2009 School Year in Jefferson County Schools*

In August of 2008, M.S. began attending seventh grade in the Jefferson County School District as a seventh grader, and he received no special services or accommodations during that school year.  M.S.'s year-end grades for the 2008-2009 school year were dismal, receiving failing grades in every subject except Art and P.E., with English (45) and Math (32) grades particularly low. M.S.'s standardized test scores in March 2009 were commensurate with his grades; he scored in the 1-10% range on every part of the test except Mathematics Problem Solving and Language Mechanics; his score in those areas was in the 10-30% range.[1]

---

[1]The time frame of this school year occurred more than two years prior to the date Lolita S. requested a due process hearing.  The court notes, however, that Lolita S. argues that the Board violated Child Find in failing to identify M.S. as needing special education services from the end of the  Fall semester of 2008 forward.  The Record reflects that neither Lolita S. nor the Birmingham City schools provided M.S.'s school records to the Jefferson County School District at the time of his enrollment through October 2011. At the time M.S. enrolled in the Jefferson County School System, Lolita S. claims to have notified some unspecified member of the school district staff that M.S. had previously repeated third grade, but she did not specifically ask for tutoring or special service until M.S. received his first progress report during the 2008-2009 year, which reflected that he was failing.  She claims to have requested help for M.S. after receiving the bad grades, but received no response to this request, so M.S. received no special academic

*2009-2010 School Year*

Because of his failing grades the year before, M.S. repeated the seventh grade during the 2009-2010 school year, and his grades that year were as follows: English - 75, Math - 60, Science - 67, Social Studies - 75, Physical Education - 89, Choir - 86, Reader's Workshop - 69, Problem Solving - 67.  M.S. did not receive special education services or accommodations during this school year.  Because he received passing grades, he was promoted to eighth grade.  His standardized tests during March of the 2009-2010 year indicated that on ARMT his reading and math scores partially met the standard and on the Stanford Achievement Tests, his total reading and reading comprehension remained below 10% with the rest of the scores remaining below 50%  in the 10-30% range.

*Special Education Evaluation and 2010-2011 IEP*

In late May or early June of 2010, after his second year in seventh grade, Lolita S. asked for M.S. to be evaluated for special education testing.  The Jefferson County District held a meeting to refer him for such testing. At that meeting, Lolita S. expressed her desire that M.S. catch up with his peers' grade level by bumping him up a grade.

In September of 2010, the Jefferson County School Board completed its evaluation of M.S. which included administering two achievement tests.  One achievement test, which placed the fifteen-year-old in the seven-to-ten-year-old range, revealed that M.S. was below average in almost all academic areas, and in some areas he was in the lower extreme.   The second achievement test, the Wechsler Individual Achievement Test II (WIAT-II), administered for his special education evaluation, resulted in the following results: grade equivalent listening comprehension of 2.5, reading comprehension of 1.9 and oral expression of 2.6.  The IQ portion

services during that school year.

of the achievement test resulted in a score of 74, which is in the fourth percentile of students.

The Board used those tests to make a determination whether M.S. was eligible for special education services. Both IDEA and Alabama's implementing regulations have thirteen separate categories of eligibility, each with its own requirements.  One way to qualify is through the significant discrepancy calculation: under this measure, the discrepancy between the IQ score and the *obtained achievement scores* must be *greater than* one standard deviation unit (15 points) below the *predicted achievement score*.  In other words, test scores needed to show at least a 16-point discrepancy between what M.S.'s IQ score predicted he could achieve versus his actual achievement scores. The Board measured the discrepancy between predicted and actual achievement two ways, and based on the first measurement, M.S. did not qualify, but based on the second measurement, he had a 16-point discrepancy in the area of oral language.[2]  In light of this discrepancy, the Board found that M.S. was eligible for special education services in the area of oral language within the category of a specific learning disability.  Using the severe discrepancy model, M.S. did not qualify for a disability in the areas of reading comprehension, writing, and math.

Based on the finding of eligibility for services in the area of oral language, the district developed an IEP for M.S. for the 2010-2011 school year.   The Board argues that this IEP appropriately addressed M.S.'s unique needs and meets the requirements of IDEA, and Lolita S.

---

[2] Using the Woodcock-Johnson achievement test, M.S. did not qualify because his predicted achievement score based on his IQ was 78 and his total actual achievement score was 67 (11 point differential) and all of his sub-test scores were higher than 62.  Using a second means of measuring, the Board started with a predicted achievement score of 83 (and the Record is unclear why the Board used the predicted achievement score of 83 instead of 78) and then compared that number to sub-test scores in oral language from two different achievement tests, the WIAT and the Kaufman. The oral language scores on both sub-tests were 67, exactly 16 points lower than the predicted achievement score of 83, so by this measure M.S. met the 16-point requirement.

argues that it did not.

*The Challenged 2010-2011 IEP*

The 2010-2011 IEP, dated September 30, 2010, addressed three areas in which M.S. was struggling: Reading, Personal Management, and Math.  Although the pages of the IEP document have M.S.'s name at the top, in pages 3, 4, and 5 of that document, under "Type of Services," another child's name is typed in, crossed through, and M.S.'s first name is written in above.  The IEP contains the signatures of Lolita S.; Cindy Anderson, the special education teacher; Delphine Rowe, the LEA representative, and an unreadable signature of a general education teacher.

In *Reading*, based on achievement testing, the IEP identified his specific weakness as Letter Word Recognition, Reading Comprehension, and Reading Composite.  The measurable goal in this area stated: "[M.S.] will apply strategies, including making inferences to determine theme, confirming or refuting predictions, and using specific context clues, to comprehend eighth grade recreational reading materials (8.1) with 70% accuracy."  The IEP did not call for a specific reading program to help bridge the gap between his current reading comprehension level of 1.9 and the goal of comprehending eight grade reading materials.  (R. 1741).

In *Math*, the IEP identified his specific weakness as Math Concepts & Applications and Math Composite and noted that he was currently failing Math with a score of 47.  The measurable goal was to "use various strategies and operations to solve problems involving real numbers (8.1) with 70% accuracy."

The IEP provided that M.S. would receive daily service for 30 minutes each in both Reading and Math from the special ed teacher, occurring in the general education classroom through inclusive services, including the following accommodations: peer helper; extended time to complete assignments; reinforcement of concepts; teacher checking for understanding;

opportunities to make up assignments; receipt of clear and concise directions; use of calculator in math; and the option of being tested with an exceptional education teacher as needed.

In the area of *Personal Management*, listed as a "transition services need," the IEP states that M.S. has a problem asking for help with assignments and is easily frustrated, resulting in shut down of effort.  The measurable goal was to "develop  communication skills to interact with others in integrated settings (e.g. expressive, receptive, written) with 100% accuracy." The IEP called for a special education teacher to service M.S. daily for 30 minutes in the general education classroom through inclusive services.

*2010-2011 School Year*

*Fall 2010  - Eighth Grade*

M.S.'s grades for the Fall semester of 2010 list as follows:   English Language Arts Grade 8 - 65; "Instru Level 1" - 87; "Instru Level 1"[3] -88; Math 8 Pre-Algebra - 47; Physical Ed Gr 7-8 - 94; Physical Science - 72; Reading Gr 8 - 62; Wrld His 8 - 73.

On September 30, 2010, M.S. took MEDC Achievement Tests and received the following results: Letter Word Recognition - 76; Reading Comprehension - 67; Reading Composite - 70; Math Concepts and Application - 77; Math Computation - 81; Math Composite - 77; Written Expression - 74; Spelling - 79; Written Language Composite - 75; Listening Comprehension - 76; Oral Expression - 61; and Oral Language Composite - 67.

*Mid-Year Move to Ninth Grade*

On January 7, 2011, despite M.S.'s bad grades in English, Reading, and Pre-Algebra, the district team held a meeting regarding whether M.S. should be moved to ninth grade.  His 2010-

---

[3] The transcript does not explain what class the abbreviation "Instru Level 1" represents, or why two classes with two different grades fall under "Instru Level 1."  However, because the transcript lists two different grades, the court assumes that the listing is not a duplicate.

2011 IEP was amended to include the following on the "Student Profile" page:

> 1/7/2011 - The committee met to discuss/finalize moving [M.S.] up to the 9th grade. [M.S.] will be turning 16 in August.  Mom is aware that [M.S.] will not get all of his credits due to missing the 1st semester of 9th grade.  He will have to make up his credits by attending summer school sessions. [M.S.'s] grades have improved somewhat.  He continues to struggle in math, which is an area of difficulty for him. [M.S.] continues to have difficulty staying in some classes for the entire period.

> Committee feel [sic] this placement will be beneficial due to age.  The committee hopes that it will encourage him to do better academically.  He is fully capable of producing great academic results if he applies himself.

> [M.S.] will be placed on the regular diploma track and his grades will be monitored.  If [h]is grades continue to drop, he will be changed to the AOD (Alabama Occupational Diploma).

> Mom states that this placement will be beneficial because he's starting to give up and being in the 9th will encourage him more by being around his peers his age.  Mom doesn't want him to drop out of school when he turns 16.

> The committee agreed on placing [M.S.] in the 9th grade at the end of the [Fall] semester.  He will continue to receive exceptional educational services through the SLD program.

(R. 1750).

The amended IEP contains the date of January 7, 2011 and the following signatures: [M.S.]; Lolita S.; Cindy Anderson; Donna King as the LEA representative; and K. Hunter, a general education teacher.  Lolita S. acknowledged that she consented to this change, but claims she did so because Anderson characterized M.S. performance as "really good as far as his academics." However, Lolita S. presumably had access to her son's grades. Lolita S. acknowledges that the team discussed moving M.S. to the AOD track, but claims that discussion focused only on M.S.'s ability/inability to make good grades and not upon whether the AOD track met M.S.'s unique needs as a student with a learning disability or upon how that track would benefit M.S. because of its "emphasis on functional skills" or "employability."

*Spring 2011 Grades - Ninth Grade*

M.S.'s grades for the Spring Semester of 2011 list as follows: Essential Math I - 86; Freshman Studies - 95; LIFE phys Ed Gr 9 - 91; LS I World History - 20; LS I Eng 9 - 71; LS II Biology - 27; Strategies Lab -39; Theatre Level 1 - 27.   These grade records indicate that M.S. did not receive full credit for both years because of this move.  As the list reflects, M.S. failed most of his classes Spring Semester, when he had been "moved up" to ninth grade; he only passed essential math and English in his academic classes.

According to Lolita S.'s testimony at the due process hearing, Anderson, M.S.'s  special education case manager for the Fall Semester of 2010, told her, in effect, that no special education case manager worked with M.S. during this semester.  However, Anderson denied that statement, but acknowledged that the school had no documentation showing that M.S.'s IEP was followed in the Spring semester.  According to the school district, M.S. did have a case manager in Spring 2011 but that person was no longer employed by the school system at the time of the hearing and did not provide testimony.

*Summer 2011*

*Summer School*

M.S. did not participate in summer school during the Summer of 2011 because of a lack of communication between the school and Lolita S.  According to Lolita S., she made inquiries about summer school but no one at the school ever contacted her and, when she finally spoke with a counselor, summer school had ended.  As noted previously, the Amended 2010-2011 IEP did call for M.S. to participate in summer school to make up the credits he missed when he moved up to ninth grade mid-year.  The district claimed that Lolita S. was aware of the dates for summer school.

*August 2011*

Lolita S. requested an IEP meeting in the summer of 2011, and she spoke with the special ed teacher assigned to M.S.'s case on August 18, 2011, within a few days of the beginning of the school year.  Anderson again became M.S.'s special ed case manager and retained this position throughout the 2011-2012 school year.  At that time, Anderson learned of problems with M.S.'s school schedule and discovered that he was not getting credit for classroom attendance.  The scheduling problem occurred when the State Department of Education converted to a new information technology system, causing scheduling problems in the Jefferson County School System and throughout the state.

*The Challenged 2011-2012 IEP*

The 2011-2012 IEP contained the following information in the student profile section: M.S. was now pursuing an AOD diploma instead of a regular diploma, and M.S. wanted to remain on that track; M.S. was doubling up on 9th and 10th grade courses to remain with his grade; M.S. did not attend 2011 summer school because of a lack of communication between the school and the parent; M.S. did not receive full credit for 8th and 9th grade courses because of the mid-year move to 9th grade.  The profile also listed the 2010 MEDC Achievement Test results and stated that M.S. "has weaknesses across the board" based on those test results.  It identifies reading comprehension, math concepts and application, written expression, and oral expression as the areas most in need of attention and notes that math computation is his strength. The profile refers to the challenge of catching up because of the mid-year move and school absence for discipline reasons, but the plan was for M.S. to double up his course load, despite his difficulty of making good grades with a normal load, and to take both ninth and tenth grade Math and ninth and tenth grade English.  The profile recorded Lolita S.'s concern that the IEP was not

13

enforced when he moved up to ninth grade in mid-year, noting his failing subjects and opining that lack of support prevented him from achieving success with the move. (R. 1759).

The 2011-2012 IEP focused on four specific areas: Personal Management, Oral/Written Expression, Math, and Reading Comprehension. In the Personal Management area, listed as a transition-related goal, the IEP stated M.S. "[wa]s starting to communicate with teachers and ask questions" but remained "somewhat reluctant" to do so, and his measurable goal was to "continue to develop communication skills to interact with others in integrated settings (e.g. expressive, receptive, written) for 80% of the time." This reduction from 100% to 80% occurred to afford M.S. a better opportunity to reach realistic goals. To work on this area, the IEP called for a special ed teacher to provide services to M.S. three times per week for 45 minutes each session in the regular or special ed classroom. Other than developing communication skills, the IEP did not include "transition skills" or skills necessary for post secondary life in the areas of employment, education, and community living. (R. 1762).

In Oral/Written Expression, the IEP noted that M.S. spoke in short, choppy sentences, and wrote sentences, but not paragraphs. The measurable annual goal stated that M.S. would receive a graphic organizer and was required to produce "a three paragraph essay to include an introduction, body and a conclusion [with] at least 80% accuracy. He will then paraphrase-retell what he wrote about for at least (2) 10 minute intervals." The services designated on the IEP were to be performed by a special education teacher three times weekly for 45 minutes each session by inclusive or pull-out services. (R. 1763). At the time of Anderson's testimony at the due process hearing in February of 2012, M.S. was still unable to complete this goal.

In Math, the IEP stated M.S.'s achievement/performance was best reflected in his achievement testing, and listed the following measurable goal: to "simplify numerical

14

expressions using properties of real numbers and order of operations, including those involving square roots, radical form, or decimal approximations with at least 8 out [of] 10 opportunities." This goal was the ninth grade math standard.   The services to be provided by the special education teacher were inclusive and pull-out services three times a week for 45 minutes a session with the following accommodations/supplemental aids and services: "peer helper, extended time on assignments, check for understanding, opportunity to make up assignments, preferential seating as needed to avoid distractions; allow one retake below 70, and calculator" plus weekly testing, as needed, with the exceptional education teacher.  (R. 1764).

In Reading Comprehension, the IEP stated that, based on achievement testing,  M.S. had "significant weakness" in that area plus weak oral expression skills, and that his measurable goals were to "identify genre, tone, and plot in short stories, drama, and poetry and identify organizational structure in essays and other nonfiction text to comprehend ninth grade recreational reading materials."  This goal was standard for the ninth grade, and was based in part on his English teacher's agreement that he was capable of working on comprehension of short stories assigned to ninth and tenth grade students.  The Record does not provide testing evidence reflecting that M.S.'s reading comprehension had increased from first grade level to ninth grade level during the 2010-2011 year.  To follow up on these math and reading comprehension goals, M.S. would receive service by a special education teacher, either his case manager or another special education teacher, three times weekly for 45 minutes for each of those two areas[4] in the regular classroom or pull-out services in the special education classroom.  (R. 1765).  When M.S. was pulled out of the regular classroom, he was generally excused from P.E. classes.

The IEP also provided that M.S. would receive the following accommodations in reading:

_____

[4] The IEP does not reflect whether these sessions are concurrent or separate.

peer helpers; extended time on assignments; teacher check for understanding; opportunities to make up assignments; preferential seating as needed to avoid distractions; the allowance of one retake for scores below 70; and the encouragement of verbal communications.  Further, M.S. has the option to test with and exceptional education teacher as needed.

The IEP did not call for M.S. to participate in any specific reading program.  (R. 1765).

The district team set up a meeting with Lolita S. to discuss the 2011 IEP.  The IEP document is dated September 28, 2011, and Lolita S. signed it, along with K. Conner, Cindy Anderson, and W. Simmon.  Lolita S. claims, however, that the district team did not adequately explain the results of their evaluations of M.S. and that she did not understand his educational needs until she obtained evaluation results from her own expert, Dr. Ackerson.  The principal was not present at this IEP meeting because of an emergency drug-related incident, and although the principal invited Lolita S. to reconvene the meeting when the principal could attend, Lolita S. did not insist on a second meeting.

*2011 Request for Due Process Hearing and Ensuing Pre-Hearing Matters*

In a letter dated October 13, 2011, Lolita S. requested a due process hearing pursuant to the IDEA, alleging that the school system had failed to provide adequate and appropriate public education services to M.S.  More specifically, the request alleged that the IEP expressed vague, limited goals insufficient to meet M.S.'s needs; that the district had committed procedural violations such as the lack of appropriate personnel at IEP meetings and inappropriate placement on the AOD track; and that the school system failed to comply with the provisions of Child Find. The letter indicated that it was transmitted by both email and U.S. mail to the State Superintendent of Education.

Lolita S. also requested "reimbursement of the parent's out of pocket expenses, including

16

for independent educational evaluations," although no IEE had been performed at that point.  (R. 1928).  Upon State Superintendent of Education's receipt of her request for an IEE at public expense by email on October 13, 2011 and U.S. mail on October 18, 2011, the Board did not provide her with any information about where she could obtain an IEE, or agency criteria applicable to IEEs.  Further, upon receipt of the request for an IEE at public expense, the Board did not file its own request for due process hearing to defend the appropriateness of M.S.'s program and to obviate the need for an independent IEE.

On October 25, 2011, the officer assigned to preside over the due process hearing held a pre-trial conference with counsel for both sides, and at that time, the Board had not yet determined all of the defenses it intended to present and took the position that it did not have an obligation to provide a copy of the child's academic records to the child's counsel.   On November 11, 2011, the Board  filed an Answer to the Due Process Request, denying, among other things, "that the IDEA authorizes the Secretary of Education to require a board of education to pay for or reimburse parents for the cost of an independent educational evaluation."  (R. 1517).  As of the time of briefing before this court, Lolita S. had not yet paid for the IEE; her counsel has acknowledged advancing the costs for that examination.

In a letter dated November 30, 2011, Lolita S. informed the Board that she planned to hire Dr. Joseph Ackerson, a pediatric neuropsychologist, to perform the IEE on M.S. Further, she requested that the Board expedite matters by sending M.S.'s academic records straight to Dr. Ackerson. (R. 1804).  Dr. Ackerson has performed at least 20 independent evaluations for Lolita S.'s counsel over the years and has also worked with school districts to develop IEPs for children.  Dr. Ackerson charges a flat fee of $2,500 for all IEEs.

After receiving notice that Dr. Ackerson would be performing an evaluation of M.S., the

17

Board did not request a hearing to show that its evaluation of M.S. was appropriate.

*Dr. Ackerson's Evaluation - Report and Due Process Hearing Testimony*

On December 1, 2011, at the request of Lolita S. and on referral by her counsel, Dr. Ackerson tested and evaluated M.S. Prior to the testing and evaluation process, Dr. Ackerson met with Lolita S. for an hour and M.S. for thirty minutes.

Dr. Ackerson's office administered a number of tests to M.S., and Dr. Ackerson acknowledged that the testing "revealed deficient to borderline deficient intellectual (previously characterized as mentally retarded)  index scores." M.S.'s full scale IQ score on the WISC-IV was 66, which falls in the range of intellectually deficient or mildly mentally retarded. M.S. earned a composite score of 63 on the verbal comprehension sub-test, which index score Dr. Ackerson identified as the strongest predictor of a child's functional abilities and which reflected deficient abilities. Further, the achievement test results revealed that M.S. had grade equivalent scores of  four to five years below the ninth/tenth grade he was then attending: his scores were 3.6 in broad reading, 5.0 in broad math, and 5.5 in broad written language.[5]  (R. 1783).

Dr. Ackerson's ultimate diagnosis of M.S. was (1) Mixed Language Disorder, (2) Dyspraxia  (a chronic developmental coordination neurological disorder also known as "clumsy child syndrome" that can affect planning of movements and co-ordination as a result of brain messages not being accurately transmitted to the body and can result in problems with writing and other fine motor skills), (3) Dysthymia ( mild depression with feelings of "learned helplessness"); and (4) noted a "[n]eed to rule out Attention Deficit Hyperactivity Disorder-

---

[5] While these achievement scores are significantly below M.S.'s actual grade level, Dr. Ackerson testified that they actually exceed expected scores based on M.S.'s IQ of 66 and  the score of 63 suggested by the verbal comprehension sub-test composite, the latter of which Dr. Ackerson identified as the best predictor of a child's functional abilities.

Inattentive type."  He acknowledged, however, that he could not rule out a diagnosis of
Intellectual Disability (formerly called Mental Retardation) but based on the Dyspraxia,
Dysthemia, lack of appropriate academic services, and inconsistent test findings, he was not yet
prepared to make that diagnosis and preferred at this point to attribute  the low scores to M.S.'s
"failure to benefit from his educational experiences" as opposed to mental deficiencies or mental
retardation. He indicated that mental deficiencies should result in consistent, across-the-board
deficient scores whereas M.S.'s scores had highly unusual fluctuation, ranging from deficient in
reading, to borderline deficient in math and written language to average in spelling and receptive
language (memory and learning, fluid reasoning, verbal fluency, numeric sequencing, and rapid
naming - "skills that are not typically preserved in individuals with [mild intellectual disabilites]
who more typically present with global cognitive deficits").  (R. 1783).

In diagnosing M.S. with a mixed language disorder, Dr. Ackerson concluded that  M.S.'s
"learning potential far exceeds his academic knowledge."  However, he did not administer any
standardized or comprehensive measure, such as the Clinical Evaluation of Language
Fundamentals (CELF) Test or the Oral and Written Language Scales (OWLS), that assessed both
receptive and expressive language skills.  The Alabama Administrative Code would require such
a test for a child to qualify under the Speech Language Impaired category.  Dr. Ackerson also did
not review the files of or consult with Dr. Wayne Fleisig, a clinical psychologist at Children's
Hospital who had met with M.S. regarding possible ADHD, but who had not reported any formal
diagnosis for M.S. Further, Dr. Ackerson did not consult with or meet with members of the
school staff even though he ordinarily does so prior to completing a student evaluation.  He did,
however, send teacher rating scales to school staff, but the teachers did not return them to him
prior to the completion of his report.   Dr. Ackerson stated that the language processing disorder

prevents M.S. from understanding what the teacher is saying and writing it down.

Dr. Ackerson concurred with the district's finding that a functionally and vocationally oriented curriculum, such as the AOD, was appropriate for M.S. According to Dr. Ackerson, standardized tests are the best evidence of actual functioning.

However, Dr. Ackerson disagreed with the IEPs for the 2010-2011 and the 2011-2012 years. He criticized the IEP goals. For example, in the 2011-2012 goals for written and oral expression, he stated that these goals were incapable of addressing M.S.'s language processing disorder and were too advanced for his current academic levels. As one example, the reading goal required him to read age-level appropriate materials when his assessment tests indicated that he read and comprehended at far below that level, and did not provide a reading program to lift those skills. He also disagreed with the "social promotion" of M.S. to ninth grade in mid-year despite the clear academic deficiencies, and to the plan of providing him instruction in both ninth and tenth grade levels when both levels are above his abilities. Dr. Ackerson recommended that M.S. be served in the regular classroom with specific services addressed to his speech and language disorder, and also recommended occupational therapy for his dysparyxia and writing difficulties.

Further, Dr. Ackerson found that the district should perform a transition assessment to examine M.S.'s current skills and provide a social skills program; assistive technology; a functional reading assessment to determine the appropriate reading program; intensive instruction in reading and math; and a behavioral management plan to improve, among other things, his motivation. Dr. Ackerson characterized these recommendations as designed to enable M.S. to make reasonable progress *not* to maximize his potential.

*2011 Fall Semester Grades*

The grades from the first nine weeks of the Fall semester were as follows: LIFE PE - A; LS Eng 9 - C; LS II Eng 10 - C; ESS Math 1 - B; LS 1 Phy Sci - D; LS I WorHist - C; LS II USHis - B.  The grades from the second nine weeks of the Fall semester were as follows: LIFE PE - A; LS I Eng 9 - 70,50, 66; LS II Eng 10 - 73, 58, 70; Ess Math I - 72, 90, 75; LS I Phy Sci - 61; LS II Biolog - 70, 49, 66; LS I WorHist - D; LS II USHis - 85, 77, 83.  The facts presented did not identify the grades for the second semester.

*Due Process Hearing*

The due process hearing occurred, off and on, over a period of five months.  It began on December 13-14, 2011, but then was continued until a time that Lolita S.'s neuropsychologist expert could continue to participate.  The witnesses who testified on behalf of the district included as follows:   the regular education teachers; Cindy Anderson - M.S.'s special ed case manager who has a Master's Degree in Special Education; Carolyn Liggins, who is a Counselor with a Master's Degree in Counseling; Norma Ramsey, who has a Master's Degree in School Counseling; Principal Van Phillips;  and Susan Wirt - Jefferson County's special ed director, who is a National Certified School Psychologist; but no outside expert.  Parts of the hearing took place in February of 2012, and it was completed on April 23, 2012.   The petitioner raised the following *procedural* issue at the hearing[6] still viable on appeal: (1) whether the IEPs drafted and implemented for the 2010-2011 and 2011-2012 school years were "appropriate" because

---

[6] In addition to these issues, Lolita S. raised additional issues that do not appear to be part of this appeal:  (1) whether appropriate school system personnel attended IEP meetings concerning M.S.; (2) whether the school system incorrectly placed M.S. on the AOD track; and (3) whether a lapse in educational services existed either by not providing M.S. with summer school services, or by not placing him in appropriately scheduled classes at the beginning of the 2011-2012 school year.

petitioner argued that he had made insufficient progress through implementation of those IEPs; and (2) whether the school system incorrectly placed M.S. on the AOD track.  The petitioner raised the following *substantive* issues: (1) whether the failure to evaluate M.S. at the conclusion of his sixth (2007-2008) and/or seventh (2008-2009) grade school years violated IDEA "child-find" provisions; (2) whether the evaluation, when it eventually occurred, was adequate; and (3) whether the child received appropriate speech/language services.

M.S.'s expert, Dr. Ackerson, testified at the hearing, and his testimony was consistent with his evaluation as set out above.   The school system personnel disagreed with much of the written report and with many of Lolita S.'s statements about her son.  The testimony of M.S.'s teachers offered a different description of M.S. than Dr. Ackerson's evaluation and his mother reported; they stated that he is quiet and respectful of authority but very social with his peers (often flirting with female students), and acts happy (usually) and "streetwise."  According to the teachers, he has no difficulty speaking or requesting assistance and he is capable of satisfactorily performing his lessons when he makes the effort.  They acknowledged, however, that he had difficulty expressing himself in writing, did not know his multiplication tables, and had to view a movie rather than read a book to complete a book report.  The problems they identified related not to M.S.'s capacity to learn but to his lack of effort and organizational skills: he is frequently tardy to class after the school day is in progress, is disinterested in school, and fails to arrive in class with the appropriate school supplies. M.S.'s guidance counselor during his first year in seventh grade  testified that her observation of M.S. did not lead her to believe that he needed to be referred for special education.

Teacher testimony at the hearing relayed that the school had initiated practical accommodations to encourage M.S. to arrive on time to class with supplies.  For example, a

teacher accompanied him to class so that he could not skip or be tardy, and his attendance improved.  M.S. also had the opportunity to take tests either in the classroom or in the resource room, as well as other accommodations listed on the IEP and available to him, such as the use of peer helpers, extended time to take tests, the ability to re-take tests with bad grades, rephrasing directions as needed, and the assistance of an inclusion teacher during testing.  Teachers were unable to identify any reading programs provided to M.S.; the "STAR" program implemented or to be implemented was an assessment of reading level competence as opposed to a reading program to increase reading proficiency.  The teachers also testified that M.S. sometimes refused to take advantage of the accommodations, refusing, for example, to re-take tests, to use an inclusion teacher during testing, or to take tests in a resource room.

M.S.'s teachers testified that they used several techniques to improve his reading ability: "Echo reading" – reading aloud and then having the child read what had already been read to him; "chunking" - dividing the reading into short segments and working one-on-one regarding reading passages; and encouraging "recreational reading" with books of the student's own choice simply to practice reading.

The special education director for the school system testified and stated criticisms of Dr. Ackerson's written report.  The director pointed out that the manual for mental disorders upon which Dr. Ackerson relied used different criteria in conducting disability evaluations that those upon which the State Department of Education required educators to rely.  She was also critical of Dr. Ackerson's diagnosis of a mixed language disorder without administering standard comprehensive language tests such as the CELF and OWLS.

*Hearing Decision*

As a result of that hearing, in a thirty-three page Decision dated May 9, 2012, the hearing

officer found in favor of the Board, finding it provided M.S. with an appropriate education, but found in favor of Lolita S. regarding her request for public funding of the IEE. The following relevant findings address the procedural issues[7]:

M.S.'s IEP for the 2010-2011 and 2011-2012 school years were appropriate and, while not perfect, substantially complied with the IDEA. He also determined that the evaluation conducted was sufficient to formulate those IEPs. The hearing officer found that the IEPs contained an adequate statement of the child's present level of academic achievement and functional performance, articulated measurable goals, and were reasonably calculated to provide educational benefit in the least restrictive environment. The IEPs were not vague but were sufficiently clear so that M.S., his teachers, and Lolita S. could know what services would be implemented and what accommodations were offered. M.S. made meager but not de minimis progress, and the meagerness of progress "may be attributed more to his cognitive level, his lack of effort, his failure to complete homework assignments, his refusal to re-take tests he has failed and his tendency to skip classes than to an inadequate IEP or the absence of appropriate special education services."

Further, the educational benefit provided to M.S. by the IEPs, when gauged in relation to M.S.'s potential, was reasonable. The IQ score that M.S.'s own expert administered was 66, and the expert pointed to the IQ verbal comprehension score – on which M.S. made a 63 – as the

---

[7] The hearing officer also made the following findings on issues not part of this appeal: (1) the absence of an administrator at the IEP meeting did not deny the parent an opportunity to participate in the IEP, impede the learning of the parent, or deny the child a free, appropriate public education; and (2) M.S.'s AOD placement was appropriate, in light of his academic history and his IQ of 66. Although his mother was not happy with the placement, his neuropsychologist agreed with it, and the hearing officer stated that placement in the regular diploma track would likely "lower his self esteem and increase his frustration and negative attitude toward school."

strongest predictor of his academic achievement, yet M.S.'s achievement scores exceeded in all but one academic area the score suggested by his verbal comprehension. M.S.'s expert acknowledged that he could not rule out that M.S. was entitled to special ed services under the designation of mild mental retardation or intellectual disability.  Under those circumstances, the hearing officer could not and did not determine that the IEP was inappropriate or that it was responsible for M.S.'s failure to achieve.

Finally, the hearing officer found that the transition services M.S. receives are appropriate and meet IDEA requirements. Acknowledging that the IEP "reveals broad and not particularly specific transition services," the officer nevertheless found that the *actual* services provided pursuant to the IEP "demonstrate that the school system is preparing the student for post-high school living."  The Decision notes that M.S. attends a class to improve note taking, class preparation, organizational skills and career planning. Outside contractors come to the school twice a week to aid M.S. and others in job assessment and interests.

As to the substantive issues, the hearing officer found:[8]

(1) The local education agency did not violate the provisions of Child Find in failing to evaluate M.S. for special ed services at an earlier point.  The evidence in the case did not establish that the school system overlooked clear signs of disability, that the system was

_____

[8] The hearing officer also made another substantive finding that does not appear to be part of this appeal:  any lapse of educational services at the beginning of the 2011-2012 year was *de minimis.* A portion of M.S.'s lack of services during this period was discipline-related, and, in any case, he was allowed to make up the work missed, whether because of scheduling or discipline.  As to M.S's lack of  summer school services, the hearing officer found that the district was excused from providing summer services because Lolita S. failed to initiate those services and knew or should have known to do so because one of her other children attended summer school during that period.  Also, the school's conversion to a new computer system and the move to a new school contributed to any failure of the school to follow up and communicate to Lolita S. about summer school when she failed to initiate that service.

negligent in failing to order testing, or that the system had no rational justification for not

deciding to evaluate.  Transferring to a school and/or failing a grade does not automatically

entitle a child to evaluation for special ed services.   Although the parent testified that she

inquired about services for M.S., the court found that the more credible evidence was that when

Lolita S. sufficiently placed the system on notice that she requested an evaluation for special ed

services, the system timely and appropriately engaged in the referral process. The parent's initial

inquiry about services did not trigger Child Find when she failed to follow-up after she was told

that further steps were necessary to receive a referral, particularly when she was familiar with the

steps for special ed evaluation through her other child(ren) placed in special ed.  Further, even if

Child Find were triggered, she failed to timely raise Child Find violations by failing to request a

due process hearing within two-years of the point she knew or should have known of a Child

Find violation.

(2) The evaluation, when it occurred, was adequate given the information disclosed by

M.S.'s IQ and two achievement tests.  "Nothing in the IDEA or its governing regulations require

a school system to assess a child for conditions such as mixed language disorder or other

problems that may be contributing to a disability with respect to which a local education agency

has no reason to suspect given the results of its tests, rating scales, and teacher observations."

(3) The fact that M.S. does not receive formal speech language services is not grounds for

finding that a free appropriate public education has not been provided.  A court cannot judge the

agency's actions and the IEP based on hindsight.  At the time of the development of both IEPs,

M.S. spoke well; he could convey his ideas on paper; and he received services for language in his

oral reading instruction and responses.  Further, the failure to provide formal speech language

services was not inappropriate "when no speech language deficiencies of a consequential nature

26

had been determined at the time the due process complaint was initiated in October 2011."  (R. 27).  "The neuropsychologist uncovered specific areas of M.S.'s learning disabilities ...[; h]owever, "his findings – while pertinent to potential revisions of Petitioner's IEP (or additional testing) – did not mean that a school system's evaluation was inappropriate."  (R. 1921)The hearing officer acknowledged that the neuropsychologist stated that M.S. needed speech language services and a reading program, but the hearing officer noted that while the neuropsychologist desired services that would maximize the potential of the child, IDEA does not require services that maximize the potential of each child; IDEA requires that districts provide a program reasonably calcuated to be of educational benefit to the child.

The hearing officer listed the accommodations granted to M.S. but determined that he "seldom takes advantage of them."  The hearing officer determined that "[d]espite the efforts of the professionals who instruct him, the child simply does not want to be in school. . . .His teachers and principal are doing their best to alleviate Petitioner's disinterest in school. However, if they fail, that failure cannot be attributed to their lack of effort.  It certainly does not constitute evidence of a denial of a free appropriate public education."

Further, because Lolita S. had also asked for reimbursement for the cost of Dr. Ackerson's evaluation of M.S., the hearing officer granted that request, ruling that the school system must reimburse her.  The hearing officer noted that the school system "chose not to file its own due process request to defend its evaluation of the child or to demonstrate that the neuropsychologist did not follow agency criteria." (R. 1922).

*Appeal*

On June 29, 2012, the Jefferson County Board of Education filed this civil action as an appeal of the finding that it must reimburse the cost of the IEE, and, as noted in the procedural

background section, the Defendant, Lolita S. filed a counterclaim in the nature of a cross appeal regarding other determinations.

### III.  STANDARD OF REVIEW

Under the IDEA, any party who is "aggrieved" by an administrative decision "shall have the right to bring a civil action ... in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy."  20 U.S.C. § 1415(i)(2)(A).  In the instant case, both parties have acknowledged grieving over the administrative Decision, although, predictably, the grief emanates from different parts of the Decision for each litigant.

The judicial review provision deviates from the familiar "substantial evidence" standard of review for administrative decisions.  IDEA directs the district court to address the decision based on a preponderance of the evidence and to "grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(A).  "Whether an educational program provided an adequate education under the Act 'is a mixed question of law and fact subject to *de novo* review.'"  *Draper v. Atlanta Indep. Sch. Sys.,* 518 F.3d 1275, 1284 (11th Cir. 2008) (quoting *CP v. Leon Cnty. Sch. Bd., Fla.,* 483 F.3d 1151, 1155 (11th Cir. 2007)).  An administrative decision challenged pursuant to the IDEA "is entitled to due weight and the court must be careful not to substitute its judgment" for that of the hearing officer.  *See Walker Cnty. School Dist. v. Bennett,* 203 F.3d 1293, 1297 (11th Cir. 2000) (citing *Bd. of Educ. v. Rowley,* 458 U.S. 176 (1982)).  "To that end, administrative factfindings 'are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why.'"  *Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.,* 349 F.3d 1309, 1314 n. 5 (11th Cir. 2003) (quoting *MM ex. rel. DM v. Sch. Dist. of Greenville County,* 303 F.3d 523, 531 (4th Cir. 2002)).

And yet, despite that call for deference to the administrative decision as to facts, the

Eleventh Circuit Court of Appeals has stressed that "the district court conducts an *entirely* de

novo review of the ALJ's findings" in IDEA cases. *Sch. Bd. of Collier County, Fla. v. K.C.,* 285

F.3d 977, 983 (11th Cir. 2002) (emphasis added).  To further erode the strength of the call for

deference, the Court of Appeals has stated that  "the extent of the deference to be given to the

administrative decision is left to the sound discretion of the district court which must consider the

administrative findings but is free to accept or reject them." *Bennett,* 203 F.3d at 1297-98 (citing

*Jefferson Cnty. Bd. of Educ. v. Ala. Dep't of Educ.*, 853 F.2d 853 (11th Cir. 1988), and *Doe v.*

*Ala. Dep't of Educ.,* 915 F.2d 651 (11th Cir. 1990)).

      One "strand of authority" recognizes that "the degree of deference a district court should

extend to the IDEA administrative determinations turns on whether the particular decision

implicates the agency's educational expertise." *See Escambia Cnty.  Bd. of Educ. v. Benton,* 406

F. Supp. 2d 1248, 1257 n. 7 (S.D. Ala. 2005) (using quoted language and citing *Loren,* 349 F.3d

at 1314 n. 5 ("Courts owe some judicial deference to local administrative agency judgments [in

IDEA cases], though that's typically limited to matters calling upon educational expertise.")).

Other decisions, by courts of appeals that are not controlling but whose reasoning is nonetheless

persuasive, suggest that the district court should accord greater deference to administrative

determinations when a hearing officer's findings appear "thorough and careful," *see Union Sch.*

*Dist. v. Smith,* 15 F.3d 1519, 1524 (9th Cir. 1994), or where they turn on credibility

determinations, *see R.D. ex. rel. Kareem v. District of Columbia,* 374 F. Supp. 2d 84, 89-90

(D.D.C. 2005).

      The Eleventh Circuit has held that "each child and his or her IEP must be examined

individually in determining whether the child has been provided 'a basic floor of opportunity'

that affords 'some' educational benefit.  The outcome need not maximize the child's education;

adequacy must be determined on a case by case basis in light of the child's individual needs."
*Bennett,* 203 F.3d at 1296 n. 10.

Although district courts are allowed to hear additional evidence at the request of the
party, *see* § 1415(i)(2)(C)(ii), when no party introduces additional evidence in a civil suit seeking
review, the motion for review operates as a motion for judgment based on the evidence
comprising the record.  As the parties did not request to submit new evidence in the instant
matter, the court will treat the cross motions as motions for judgment based on the administrative
record.

### III.  ANALYSIS OF ISSUES PRESENTED

The issues presented on appeal fall into two categories: the "Appropriate Education"
issue, raised by Lolita S.; and the "Independent Educational Evaluation" issue, raised by the
Board.  The court will address each separately.

### A.  THE "APPROPRIATE EDUCATION" ISSUE

The purpose of the IDEA is "to ensure that all children with disabilities have available to
them a free and appropriate education [FAPE] that emphasizes special education and related
services designed to meet their unique needs and prepare them for further education,
employment, and independent living."  20 U.S.C. 1400 (d)(1)(A).   The Administrative Decision
determined that the district provided M.S. with a FAPE based on his unique needs, but Lolita S.
disagrees.  The Supreme Court has formulated a two-part test to analyze whether a FAPE exists
in cases arising under the IDEA: "First, has the State complied with the procedures set forth in
the Act?  And second, is the individualized educational program developed through the Act's
procedures reasonably calculated to enable the child to receive educational benefits?"  *Board of
Educ. v. Rowley,* 458 U.S. 176, 206-07 (1982).

Lolita S. asserts that the court should overturn the Administrative Decision for three reasons, with subissues. The three reasons are that the hearing officer erred: (1) in finding that M.S. received a FAPE; (2) in finding that the district's evaluation of M.S was adequate; (3) in finding that the district complied with IDEA's Child Find requirements; (4) in finding that the statute of limitations bars the claims arising before October 2009; (5) in finding that M.S. is not entitled to an award of compensatory education. The court will address these assertions in turn.

**1. Did M.S. Received a FAPE**?

Lolita S. argues that M.S. did not receive a FAPE for six reasons: (1) insufficient evidence exists that M.S. progressed as a result of the IEP; (2) M.S.'s "meager" progress does not equate to a FAPE and does not comply with the IDEA; (3) the Decision fails to properly credit Dr. Ackerson's testimony and report; (4) the record does not support the hypothesis that M.S.'s "meager" progress results from M.S.'s actions (alleged absences, missing assignments, etc.) instead of acknowledging the significance of M.S.'s disabilities; (5) the evidence does not support the hypothesis that M.S.'s "meager" progress results from M.S.'s low cognitive abilities; and (6) the Decision's finding regarding transition services is contrary to the IDEA's mandate. To ensure a comprehensive judicial determination for appellate purposes and to minimize inefficiencies on appeal, the court will address each of these legal issues.

The court notes that Jefferson County's brief failed to address these specific arguments. Instead, the brief block-quoted the hearing officer's findings and argued generally that the district's obligation was not to turn a slow, unmotivated learner into a fast learner. Block-quoting the Decision, which is already part of the Record available to the court, is less than helpful, and the court is left to address most of the specific issues raised without the benefit of any targeted response from Jefferson County.

1. & 2.  Alleged failure to progress and/or "meager" progress

In these two sections of Plaintiff's brief, she argues that M.S. did not progress as a result of the IEPs and their implementation in 2010-2012 or that his progress was so "meager" that it does not comply with the IDEA.  The court understands that every parent wants to see her child progressing in school.   The hope – and, indeed, the goal often expressed in the IEPs – is that, after the formulation and implementation of IEPs, positive results will ensue, and the child will become a successful student.

The court notes at the outset, however, that a child's failure to progress does not necessarily mean that the district has violated the IDEA and failed to provide a FAPE.  The IDEA requires school systems to establish an IEP producing an educational program that is *reasonably calculated* at the time it is developed to lead to meaningful educational benefit.  The IDEA does not require systems to produce such a program that actually results in a child's academic success or even that actually results in meaningful progress.  *See Bd. of Educ. v. Rowley,* 458 U.S. 176, 207 & 208-09 (1982) (Although an IEP must be reasonably calculated to enable a child to receive a meaningful educational benefit, as the Senate report on this statute states, the special education process is "not guaranteed to produce any particular outcome.").

Similarly, a court does not measures FAPE by whether the student progresses on schedule to the next grade level, although whether he receives passing grades and, thus, progresses from grade to grade is one important factor, among many, that the hearing officer and court view in determining whether the IEP was reasonably calculated to provide a meaningful educational benefit.  *Id.* at 207 & n. 28.  The IDEA does not call for judging the actions of the district based on hindsight or based on testing and expert evaluations that were not available to the district at the time of the IEPs' formulation.  *See Susan N.  v. Wilson School District*, 70 F.3d 751, 762 (3rd

Cir. 1995); *Roland M. v. Concord School Committee,* 910 F.2d 983, 992 (1st Cir. 1990).  Instead, IDEA requires school district to provide a "basic floor of opportunity" but does not require maximization of potential.  *See Draper,* 518 F.3d at 1289 (quoting *Rowley,* 458 U.S. at 201 and citing *JSK by and through JK v. Hendry County Sch. Bd.*, 941 F.2d 1563, 1572-3 (1991)).

Accordingly, the court will consider M.S.'s "meager" progress, or lack of progress, as one important factor in determining whether the IEP was reasonably calculated to provide a meaningful educational benefit, but the court does not consider that one factor as determinative.

3.  Dr. Ackerson's Testimony

Lolita S. argues that the hearing Decision "fails to properly credit Dr. Ackerson's testimony and his report, despite the fact that the District offered no credible evidence refuting Dr. Ackerson." (Lolita S.'s Br., Doc. 17 at 27).  The parts of Dr. Ackerson's testimony that she points to are (1) his testimony regarding the deficiencies with M.S.'s previous IEPs – specifically, M.S.'s need for a program that includes "speech and language therapy, occupational therapy, assistive technology, intensive instruction in reading and math, and a behavioral management plan or other strategies to improve [M.S.'s] motivation"; (2) his testimony that M.S.'s IEP reading goals were inappropriate given that his skills were at the elementary level and his reading goal required him to read at the ninth grade level; and (3) his testimony that his recommendations were designed to enable M.S. to make reasonable progress, not to maximize his potential.

The court addresses at the outset the argument that because the district provided no outside expert testimony to counter Dr. Ackerson's testimony, the hearing officer and this court must accept Dr. Ackerson's findings.  The court disagrees with this argument.  Individuals need not be hired from *outside* a school system to be considered an expert. And the school system staff

who testified had varying levels of expertise, either through post-graduate education or on-the-job training and experience, in special education and disabilities.  Further, some of the staff personnel had special education training and most had the benefit of  much more experience and contact with M.S. himself than Dr. Ackerson enjoyed.  District staff could certainly testify about whether they agreed with his conclusions, but the weight given to their testimony would depend upon the basis for that testimony and their expertise in the area of the testimony.

In any event, the fact that Dr. Ackerson is the only outside expert who testified in this case does not mean that the court must accept his testimony nor does it mean that the hearing Decision was necessarily in error because the hearing officer failed to do so.

(1) a.  Speech and Language Therapy

The court first looks at the information available to the Board at the time the staff developed the IEPs.  As noted previously, the record reflects that in September of 2010, when the Board found M.S. eligible for special education services, the Board's evaluation showed that he qualified for special ed services because on two different achievement tests, he received scores in the area of oral language that were more than one standard deviation – 16 points –  below his predicted achievement score.  Similarly, on one achievement test, M.S. received grade equivalent scores of 2.5 in listening comprehension and 2.6 in oral expression, demonstrating over a  five year discrepancy between the grade level of his achievement score and the grade level he was then attending.  In addition to the testing information, the district had information available to it through M.S.'s grades, and teacher and staff's observation of him and experience with him.  The testimony reflected that M.S. spoke well, that his words were easily understood, and that he could convey his ideas on paper, although he often wrote and spoke in short, choppy sentences.

In light of this information, the court must determine whether the IEPs were appropriate.

34

The IEPs did not ignore the need for assistance in the area of oral and written expression based on the testing and information about M.S. available to the district.  Under the "Personal Management" area,  the 2010-2011 IEP  addressed the following measurable, annual goal for language skills:  "By May 2011, [M.S] will develop communication skills to interact with others in integrated settings (e.g., expressive, receptive, written) with 100% accuracy."  To implement this goal, the IEP called for M.S. to receive services by a special ed teacher 30 minutes daily.  The "present level of academic achievement and functional performance" referenced M.S.'s failure to ask teachers for help with assignments.

The 2011-2012 IEP went further.  In addition to continuing to work on communication in the  "Personal Management" area, this IEP added a new area of "Oral Expression/Written Expression."  In that area, the IEP noted that the student "doesn't speak very long and his sentences are often choppy."  Accordingly, the measurable goal was "Given a graphic organizer, [M.S.] will produce a three paragraph essay to include an introduction, body and a conclusion [with] at least 80% accuracy. He will then paraphrase/retell what he wrote about for at least (2) 10 minute intervals."  The IEP called for M.S. to receive services of a special ed teacher for 45 minutes three times a week for his personal management goals and for his oral expression/written expression goals, including pull out services, and a daily accommodation was the encouragement of verbal communications and a teacher check for understanding.

The hearing testimony indicated that either M.S.'s special case manager or another special education teacher pulled him out of physical education classes and worked on his communication skills.  Teacher testimony at the hearing indicated that they implemented accommodations expressed in the IEP and also rephrased directions as needed to ensure that M.S. processed and understood directions.  As is clear from this recitation, the IEPs did not

ignore M.S.'s weakness in oral language and communication skills but addressed it, or attempted to address it.

Lolita S. argues – based on Dr. Ackerson's testimony – that the IEPs did not do enough in that general area of language and communication and, specifically, in speech language. Dr. Ackerson testified that M.S. has a lifelong mixed language processing disorder that prevents him from expressing himself and in understanding what the teacher is saying. This diagnosis of a mixed language disorder was a new one that occurred in December of 2011, *after* the formulation of the IEPs in question. According to Dr. Ackerson, M.S. needed a comprehensive evaluation including specific speech language evaluation resulting in specific goals and "a person working with the teacher making sure that what's being taught in the classroom is something that [M.S. is] able to understand, comprehend, and to respond appropriately to." (R. 412-13).

The hearing officer found that the evidence failed to support the position that the IEPs and the program implementing them were not appropriate in this area. Rather, he focused on the information available at the time the IEPs were formulated and found: "Initially, based on the testimony of personnel employed by the local education agency there was no reason to suspect that the child suffered from a speech language disorder. The child spoke well. He could convey ideas on paper. Petitioner received services for language in his oral reading instruction and responses. The fact that he does not receive formal speech language services is not grounds for finding that a free appropriate public education has not been provided particularly when no speech language deficiencies of a consequential nature had been determined at the time the due process complaint was initiated in October 2011." (R. 1915).

In his Decision, the hearing officer noted that, now that the district is on notice of a potential speech language problem with a specific diagnosis of a mixed language disorder, he

hoped the district would act on that new information and "undertake appropriate speech evaluations to determine if Petitioner needs more formal speech services." The hearing officer had previously noted that the special education director for the district was critical of the diagnosis that Dr. Ackerson had reached and his call for speech language therapy because he had done so without administering the CELF and OWLS tests designed to measure the expressive and receptive components of a mixed language disorder.

The court agrees with the hearing Decision on this issue, finding that the assessment and the program provided to M.S. was appropriate in this area based on the information available at the time of the IEPs' formulation and up to the point the due process complaint was initiated. As the hearing officer acknowledged, no IEP is perfect and M.S.'s 2010-2011 and 2011-2012 IEPs were not perfect. They were, however, reasonably calculated to confer upon M.S. a meaningful benefit in the area of written and oral expression based on the weaknesses identified at the time. Regardless of whether Dr. Ackerson's December 2011 diagnosis was correct and whether new tests are needed to confirm or reject it, this diagnosis and any such tests were not available to the district at the time of the formulation of the IEPs and the development of an education program for M.S. as of the date of the request for a due process hearing. Therefore, they could not be a basis of a determination of the issue before this court, and this court should not and will not engage in judging by hindsight. However, that finding does not mean that the new information is not relevant to the formulation of IEPs developed *subsequent* to the sharing of the new information or modification of existing IEPs. Now that the district has been put on notice of the new information, it should consider that information and determine the effect that information has on IEPs or determine if further testing and evaluation are necessary to confirm or deny the new information.

(1) b.  Occupational Therapy with Assistive Technology

Another of Dr. Ackerson's determinations was that M.S.'s program was inappropriate because it did not provide occupational therapy with assistive technology for M.S.'s dyspraxia. Once again, the dyspraxia diagnosis occurred in December of 2011, *after* the formulation of the IEPs and *after* the request for a due process hearing.  Therefore, for the same reasons discussed in the section above, the court finds that the hearing officer's Decision on this issue did not represent an error; M.S.'s program was appropriate – despite the lack of an occupational therapy component with assistive technology – to address any difficulty raised because of Dr. Ackerson's December 2011 diagnoses and report.

(1) c.  Motivation

Dr. Ackerson opines that M.S.'s program is insufficient and inappropriate because it does not include a behavior modification program to increase his motivation to do well in school.  He opined that vocational training was key in motivating M.S., explaining the connection between school classes and job skills.  However, in his hearing testimony, Dr. Ackerson acknowledged that the district had already taken some positive steps in this area: placing M.S. on an occupational diploma track and placing him with a coach mentor.  The coach mentor was important because of M.S.'s need to have a relationship with a male role model in light of his father's absence, and also because of his interest in sports but inability to play on a team in light of his grades.  Dr. Ackerson testified that he would like to see the school continue these areas of motivation and carry them "out a bit further."  (R. 408).

The hearing Decision noted M.S.'s disinterest in school and acknowledged the many ways the school had attempted to ensure that he stayed in school, attended class, remained focused, and did not become frustrated:  teachers accompanying him to class to ensure that he did

not skip; teachers giving positive reinforcement and praise; the Board's providing

accommodations such as peer helpers, extended time to take tests, teachers providing the

opportunity to re-take tests or take tests in the resource room with fewer distractions, teachers re-

wording verbal instructions, teachers reading aloud instructions upon request, etc.  The hearing

officer found that despite these efforts and the many accommodations available to M.S., he rarely

took advantage of the accommodations, did not want to be in school, felt that he does not fit into

the school environment, wanted to be with his friends that have left school, and wanted to join

the federal job corps program.  The officer concluded that if the district has failed to alleviate

M.S.'s interest in school, that failure is not attributed to its lack of effort and "does not constitute

evidence of a denial of free and appropriate public education." (R. 1916).

The court agrees with the hearing officer and the district that the efforts to motivate M.S.

have been sufficient and appropriate, and that the failure to institute a behavior modification

program does not deny him a free and appropriate education.   As previously noted, the court

rejects Lolita S.'s argument that the court must accept Dr. Ackerson's opinion on this issue

because the district did not counter that opinion with expert testimony refuting it; to the extent, if

any, that this issue requires expert testimony instead of common sense, the district has produced

numerous "experts" in the form of experienced school system staff who can speak to these

matters.

(1) d. and (2).  Intensive Instruction in Reading and Math and Inappropriate
Reading Goals

In its list of deficiencies that Dr. Ackerson identified, Lolita S.'s brief includes the failure

to provide intensive instruction in both reading and math.  However, the argument section of that

brief focused only on IEP deficiencies in the reading area, and did not provide any discussion

regarding the alleged deficiencies in math.    Accordingly, the court will address the issue of whether the IEP goals in the area of reading and strategies to reach those goals were appropriate and met the requirements of the IDEA. Because this discussion combines the issues of alleged deficiencies in reading instruction and the inappropriateness of reading goals, the court will address all issues regarding reading at once in an attempt to be more efficient.

Dr. Ackerson first objected to the IEPs' reading goals as inappropriate because they were unrealistic: given that M.S.'s 2010 achievement testing placed him at the elementary school level, the 2010-2011 goal of reading eighth grade materials with a 70% accuracy rate and his 2011-2012 goal of reading ninth grade materials with a 70% accuracy were not attainable as a practical matter.

Second, Dr. Ackerson found the IEPs to be inappropriate because, given M.S.'s elementary school level reading skills, they provided no reading program to bridge the gap in reading by increasing the level of his reading skills.  Dr. Ackerson recommended that the district hire a reading specialist to evaluate M.S. to determine whether the Lindamood-Bell or the Orton-Gillingham reading approaches or some other approach best met his needs.

The hearing officer found, however, that the challenged IEPs adequately addressed M.S.'s reading needs.  In doing so, he stated in a conclusory manner that the reading goals were "sufficiently appropriate" but did not specifically address Dr. Ackerson's objections.  Although the Decision noted that the IEP contained goals and accommodations in reading, the mere fact that the IEP lists goals and accommodations does not mean those goals and accommodations were appropriate ones to meet M.S.'s unique needs.  And, similarly, the Decision noted that M.S. receives pull-out services in reading.  Again, the existence of pull-out services with no explanation of how the pull-out services met M.S.'s unique needs does not demonstrate the

appropriateness of those services, especially when the pull-out services were unaccompanied by any reading program to attempt to increase his deficient reading skills. Although the hearing officer did not find that M.S.'s current education program was deficient even though it was unaccompanied with a reading program, he nevertheless appeared to acknowledge the importance of a reading program for M.S. He stated: "it is hoped that the school system will the assess the child further for a reading program specific to his needs."

The court recognizes that no IEP is perfect and also recognizes that sometimes the paperwork does not reflect the actual services provided to a student and the time and effort that teachers dedicate to help and serve him. But, IDEA requires IEPs that include a reasonably accurate assessment of students and meaningful goals. In M.S.'s case, the reading area of the IEPs did not include meaningful goals *for M.S.* In light of M.S.'s achievement testing of grade level 1.9 reading comprehension[9], to set a goal in 2010-2011 that he jump six reading levels in one year is unrealistic and unreasonable. The district objects to the characterization of the IEP goal as requiring M.S. to *read* at the eighth grade level. It insists that the goal was "to comprehend eighth grade materials using appropriate strategies." The court finds such parsing to be disingenuous: comprehending eighth grade reading materials is comprehending eighth grade reading materials. One has to be able to read before one can comprehend.

One explanation for such unrealistic goals is that the reading area of M.S.'s IEP was not really designed for him and his unique needs. Indeed, the 2010-2011 IEP has M.S.'s name at the top but has another child's name written below and crossed out with M.S.'s name written in. If

---

[9] The court notes that the achievement test administered by Dr. Ackerson's office measured M.S.'s letter word recognition at grade 3.8, still more than four grade levels below the 8th grade IEP reading comprehension goal. As noted previously, however, the testing available to the district at the time of the formulation of the relevant IEPs reflected a reading comprehension level of 1.9.

the district attempted to use a stock IEP written generically for every eighth grade child needing

an IEP for reading then that attempt is misplaced and violates IDEA's requirements that the IEPs

be tailored to each child's individual needs.

Further supporting the use of stock IEPs is Anderson's testimony regarding the

formulation of M.S.'s 2011-2012 IEP:

> Q.  Okay.  Now, the [reading comprehension] goal is for [M.S.] to
> identify genre, tone, and plot in short stories, drama and poetry and
> identify organizational structure in essays and other nonfictional text to
> comprehend 9th grade recreational materials.
>       Now, his last year's goal included comprehending 8th grade
> recreational materials.  Do you know if he met that goal?
>
> A.  No.
>
> Q.  Okay.  All right.  How did you choose the annual – the 9th grade
> recreational materials goal?
>
> A. Again, it's a 9th grade goal. . . .
> ***
> Q. Do you know what grade level [M.S.] is currently reading at?
>
> A.  I don't.

This testimony indicates that the IEP for reading was not designed for M.S.: it was the

"9th grade goal" regardless of whether it fit his particular needs.  The testimony also indicates that

the teachers formulating the IEP did not bother to determine whether he had met the previous

year's rather extraordinary goal of increasing his reading comprehension by six grades when they

formulated his 9th grade IEP; they just inserted the standard 9th grade goal.

Such a practice flies in the face of the purpose and goals of the IDEA, which require the

district to develop an *individualized* program with *measurable* goals.  While some children

attending 9th grade and requiring special education are capable of meeting the state 9th grade

goals *with help*, others, like M.S., are so far below grade reading level that expecting them to

42

reach the state goals, even with help, is unrealistic.

The point of requiring an *Individualized* Education Program is to have the program meet the child's unique needs, not to assume that *all* children in special education are capable of meeting state goals for that grade. Further, the point of requiring measurable goals in the IEP is subsequently to *measure* progress: to see whether the program did what it was intended to do and whether the child met that goal. The court is troubled that the district staff made no effort at the end of the 2010-2011 school year to determine whether the IEP was working for M.S. Rather, the staff appeared to insert stock 9th grade reading goals in M.S.'s IEP, just moving him along up the grade ladder. The court finds that the district should have regularly assessed M.S.'s reading skills to determine his current reading level and to determine, at the end of each school year, whether he had met his IEP reading goal for that year. That information was important for special education staff members to have so that they could measure M.S.'s progress, or lack thereof, in reaching his IEP goals for the previous year and so that they could formulate appropriate, measurable goals for the next year.

The lack of a reading program also troubles the court. Given M.S.'s dismal reading comprehension scores and the district's goal for M.S. to dramatically increase his reading level, the existence of some sort of reading program to increase his skills would appear to be a basic component of any appropriate educational program; again, the district could not realistically expect him to make that jump in reading levels without help. And yet, the evidence reflects that as of the December of 2011 hearing, the district had offered no such reading program to M.S. When teachers were asked whether the district had implemented any reading program for M.S., their testimony indicated that the school system "intended" to participate in the STAR program. STAR is a reading *assessment* program for all students to assess a student's reading level but not

to increase reading skills.  The court notes that if the system was still "intending" to implement the program at the time of the hearing, then half to three-quarters of the school year had already passed at that point.  Even assuming *arguendo* that the school system eventually followed through with that intent, the implementation of the *assessment* program without an accompanying *reading* program would, at most, provide M.S. with a program reasonably calculated to *assess* but not to *increase* his reading skills.

The court FINDS that the reading areas of M.S.'s 2010-2011 and 2011-2012  IEPs were not appropriate in that they were not designed to  meet M.S.'s unique needs. Thus, they were not reasonably calculated to enable M.S. to receive educational benefits.  Further, the evidence reflects that the implementation of those IEPs was not reasonably calculated to enable  M.S. to receive educational benefits.  The hearing officer erred in finding that the reading areas of the IEPS as implemented adequately addressed M.S. needs, and whether that error is phrased as the failure to credit Dr. Ackerson's testimony on that subject *or* the failure to acknowledge obvious deficiencies confirmed by his testimony, the error exists.

Although Lolita S.'s brief did not specifically discuss the math area of the IEPs in the argument section, to the extent, if any, that the math areas suffered from the same deficiencies – i.e., the staff used stock goals that were not designed to meet M.S.'s unique needs – then, those areas would also violate the IDEA, and the hearing officer will have an opportunity to address that violation on remand.

(3) Reasonable Progress vs. Maximize Potential

Lolita S. argues that the hearing officer erred in failing to credit Dr. Ackerson's testimony that the programs he advocated for M.S. were necessary for him to make "reasonable progress" in compliance with the IDEA and did not go beyond the IDEA's requirements by attempting to

maximize his potential.  The court agrees with the hearing officer and the district on this issue;

the hearing officer, and this court need not accept Dr. Ackerson's characterization of his own

testimony and report as complying with but not exceeding the requirements of the IDEA,

particularly when it has the benefit of testimony from other experts in the field of education.

And, regardless of whether the experts had seen Dr. Ackerson's report, they could certainly

testify about whether they agreed with his conclusions; however, the weight given to their

testimony would depend upon the basis for that testimony and their experience in the area.   As

noted previously, individuals need not be hired from outside a school system to be considered an

expert, and at least some of the school system staff had expertise, either through post-graduate

education or on-the-job training and experience, in special education and disabilities.

(4. & 5.)  Hypothesis about the reason for  M.S.'s "meager" progress

Lolita S. argues that the hearing officer was incorrect to hypothesize that M.S.'s "meager"

progress results from his own actions or his low cognitive abilities.  The hearing officer's

Decision states: "His meager progress may be attributed more to his cognitive level, his lack of

effort, his failure to complete homework assignments, his refusal to re-take tests he has failed and

his tendency to skip classes than to an inadequate IEP or the absence of appropriate special

educational services." (R. 1910).  The evidence submitted includes support for the portion of the

statement that M.S. sometimes refused to re-take tests, to ask for help, to take tests in the

resource room free of distractions, and to do his homework.  The evidence also reflects that he

sometimes skipped classes and that the school began making sure a teacher walked him to class

to ensure his attendance.  Thus, to the extent that the hearing officer attributes a *portion* of M.S.'s

"meager" progress to his own actions, the evidence supports that attribution.

But the evidence also reflects through IQ tests that M.S.'s failure to achieve at grade level

was a result of his significant cognitive deficits, so a *portion* of his "meager" progress may be attributable to those cognitive deficits.  And, although the hearing Decision does not say so, as the court has discussed previously, a *portion* of his "meager" progress is attributable to the inappropriate IEPs to the extent that they were not tailored to meet M.S.'s unique needs.  The blame for failure to progress does not fit solely on M.S.'s shoulders, but neither does it land solely on the district; unfortunately, the blame is distributed among the parties, and, of course, some portion is the unfortunate result of DNA and matters beyond any parties' control.

6.  Transition Services

Lolita S. also argues that the evidence does not support the determination that the transition services stated in his 2011-2012 IEP are appropriate and are sufficiently preparing him "for post-high school living."  She lists the following reasons for that conclusion: (1) the district's failure to conduct any transition assessment to identify his transition needs; (2) the district's failure to include *personalized* transition services tailored to M.S.'s unique needs; (3) the determination that M.S.'s dysthymia and impaired cognition rendered him unable to handle additional transition services; and (4) M.S.'s failure to receive a meaningful educational benefit from the transition service actually provided.

IDEA indeed requires that an IEP contain appropriate "transition services" beginning when the child is sixteen years old, or younger if appropriate.  *See* 20 U.S.C. 1400(d)(1)(A); 20 U.S.C. 1414(d)(1)(a)(i)(VIII); 34 C.F.R. 300.320(b).  *See also* 34 C.F.R. 300.43 (defining transition services as a "coordinated set of activities... focused on improving the academic and functional achievement of a child with a disability to facilitate the child's movement from school to post-school activities [including] vocational education, integrated employment ... adult services, independent living, or community participation" and, if appropriate, training in the

"acquisition of daily living skills." ).  Every IEP for a person in this age range must include

"appropriate measurable post-secondary goals based on an age appropriate transition assessment

related to training, employment and where appropriate, independent living skills," and to

describe the "transition services ... needed to assist the child in reaching theses goals.  20 U.S.C.

§ 1414(d)(1)(A)(I) VIII (aa)-(bb).

M.S.'s 2011-2012 IEP included the transition services that Lolita S. challenges as

inappropriate.  The student profile section of his IEP states "Transition assessment shows a need

in personal management" but does not explain what specific "assessment" occurred. (R. 1759).

Under the "Transition" section of the IEP, the "Transition Goals" remain the same as the year

before, stating as follows: "Student will be prepared to participate in post-secondary

education/training based on completion of graduation requirements and submission of

application for enrollment."  Under the "Community/Independent Living Goal" the IEP states the

same information as the year before: "Student will be prepared to participate in community

activities and live independently based on independent living skill level achieved and

identification of community/living options."  For both IEPs, under "Transition Services" with 12

blocks as options, only one block was checked: personal management.   (R. 1738 & 1761).

Under personal management, the only goal is: "By May 2012, [M.S.] will continue to develop

communication skills to interact with others in integrated settings (e.g. expressive, receptive,

written) for 80% of the time."  (R. 1762).  Under the type of services, the IEP mentions

encouraging the student to communicate.   The IEP does not mention, however, any other skills

or evaluations traditionally connected to transitioning from school to job or independent living.

Dr. Ackerson's testimony indicated that he did not see evidence of an appropriate

transition assessment on behalf of the district.  Further, he testified that most of the IEP's

transition services blocks should be checked, whereas the IEP limited transition services to personal management.  Specifically, Dr. Ackerson testified that M.S. needed services in the following specific areas that were not checked on his IEP: vocational evaluation, employment development, post-secondary education, financial management, transportation (because the doctor stated that "I don't think he's going to be able to drive himself.  Certainly not in the near future."), living arrangements (explaining "that depends on, you know, home situation.  I don't think he can live independently"), advocacy/guardianship, community experiences, and linkages to agencies.  (R. 421-424).

At the time of the hearing Decision, M.S. was sixteen years old and eligible for transition services.  According to the hearing Decision, the transition services provided to M.S. were appropriate.  Despite noting that the IEP  "reveals broad and not particularly specific transition services," the hearing officer determined that "the *actual* services provided through the Petitioner's IEP demonstrate that the school system is preparing the student for post-highschool living."  He proceeded to refer to a class "directed to improving note taking, class preparation, organizational skills and career planning." (R. 1917).  According to Lolita S., this class is offered to all freshman and is not tailored to M.S.'s unique transition needs, and because M.S. is unlikely to go to college, the portion of the class dedicated to note taking and class preparation may help in high school but is not helpful to him as a *transition* to life beyond high school.  The hearing Decision also states that "[o]utside contractors come to the school twice a week to aid the child and others in job assessment and interests" but later suggests – but does not require– "that the school system undertake to begin vocational assessments of the child" to provide him with the vocational and academic services Lolita S. requests.  Finally, the Decision determined that M.S. is not "positioned to receive a more substantial transition plan" because of his mild depression

and low cognitive functioning.  (R. 1918).

The court disagrees with the hearing Decision that the transition services were appropriate.  If the IDEA requires IEPs to include "appropriate measurable post-secondary goals based on an age appropriate transition assessment" and to describe "transition services," then the IEP needs to do so.  In M.S.'s case, the IEP did not.  He turned 16 during the 2011 year, and the failure of the 2011-2012 IEP to include required *individualized* transition goals, transition assessments, and transition services means that the IEP did not comply with the IDEA.

The briefing does not address what case law has interpreted the phrase "age appropriate transition assessment" to mean and whether some leeway exists about the date of that assessment – i.e. whether the first transition assessment must occur no later than the year the student turns sixteen or whether, under some circumstances, it can occur later. Absent such information, the court concludes that the regulation means what it says[10]: that the IEP in effect when the child turns sixteen must include transition information based on an assessment.

The hearing officer's "suggestion" but not "requirement" that the district conduct such an assessment in the future appears to fly in the face of the IDEA; a few paragraphs before that "suggestion," the officer listed the IDEA provision regarding transitions and transition assessment using the verb "requires."  (R. 1916).  Further, the fact that the officer is suggesting that the transition assessment be performed appears to confirm that such an assessment has not yet occurred.  Accordingly, the court finds that the district erred in failing to provide a

---

[10] 34 CFR 300.320(b) states as follows: "Transition services.  Beginning not later than the first IEP to be in effect when the child turns 16, or younger if determined appropriate by the IEP Team, and updated annually, thereafter, the IEP must include - (1) Appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills; and (2) The transition services (including courses of study) needed to assist the child in reaching those goals.

meaningful transition assessment.

The court does not agree with the hearing officer that because M.S. has received some vocational and career-based training along with the rest of the freshman class that was not personalized to his unique needs, he received adequate transition services. And, a vague statement on the IEP that "student will be prepared to participate in post-secondary education" when the evidence indicates that M.S. is on an AOD track and is not positioned for college appears to confirm that the IEP is using stock language not individualized to meet M.S.'s unique transition needs.

Finally, the court does not agree that M.S.'s alleged depression and low cognitive functioning means he is not "positioned" to receive a more substantial transition plan.  The testimony differed about the extent of  M.S.'s depression, with Lolita S. and Dr. Ackerson (who saw M.S. for thirty minutes) characterizing him as depressed and, by contrast, his teachers disagreeing with that characterization and calling him "social" or a "social butterfly"; however, even Dr. Ackerson labeled M.S.'s  depression as mild.  As to the low cognitive functioning, the hearing Decision emphasized that M.S. "barely" qualified for special ed services in 2010 and, given that emphasis, to now determine that the cognitive functioning was so low that he cannot benefit from additional transitional services would appear to be an inconsistent ruling. (R. 1920). 35).

For all of the above reasons, the court FINDS that the transition services in M.S.'s IEP and implemented through the IEP were not appropriate in that they did not comply with the requirements for such services in the IDEA.

In sum, the court FINDS that the Decision determining that the district provided M.S. with a FAPE is due to be REVERSED and REMANDED *as to the areas of reading and*

50

*transition skills,* because neither his IEPs nor the yearly implementations of his IEPs in those areas were reasonably calculated to enable M.S. to receive educational benefits.   In the other areas challenged above, the court FINDS that the Decision is due to be AFFIRMED.

### 2.  Was the District's Evaluation of M.S. Adequate?

Lolita S. asserts that the district's evaluation of M.S. was inadequate because it failed to provide the following assessments:   a more comprehensive speech/language evaluation, an occupational therapy evaluation, a functional reading assessment, and a transition skills assessment. The court has already covered these arguments in previous sections of this opinion. In summary, based on the information the district had available to it prior to the due process hearing request, the court FINDS as follows: (1) the district did not err in failing to provide a more comprehensive speech/language evaluation; however, now that the district has been put on notice of the new information from Dr. Ackerson, it should consider that information and determine if further testing and evaluation are appropriate; (2) the district did not err in failing to provide an occupational therapy evaluation with assistive technology; however, now that the district has received notice of M.S.'s diagnosis of dyspraxia and of the related recommendations from Dr. Ackerson, it should consider that information and determine if further evaluation and therapy are appropriate; (3) the district erred in failing to provide M.S. with a functional reading assessment; and (4) the district erred in failing to provide M.S. with a meaningful transition skills assessment.

### 3.  Does the Statute Bar Claims Arising Before October 2009?

Lolita S. asserts the hearing Decision incorrectly found that  IDEA's statute of limitations bars claims arising before October of 2009.  IDEA has a two-year statute of limitations, requiring parents to request a due process hearing "within 2 years of the date the parent ... knew or should

have known about the alleged action that forms the basis of the complaint."  20 U.S.C. §

1415(f)(3)(c).  Because the request for a due process hearing occurred in October of 2011, the

statute barred all claims arising before October of 2009 *unless* (1) the statute did not begin to run

on the claim because the parent did not know/should not have known about that action until a

time within two years of the due process request; or (2) the statute is tolled; or (3) an exception to

the statute applied.

IDEA contains the following provision setting our exceptions to the two-year period:

> The [two-year] time line described ... shall not apply to a parent if the parent
> was prevented from requesting the hearing due to – (i) specific
> misrepresentations by the local educational agency that it had resolved the
> problem forming the basis of the complaint; or (ii) the local educational
> agency's withholding of information from the parent that was required under
> this subchapter to be provided to the parent.

20 U.S.C. § 1415(f)(3)(D).

Lolita S. claims that she did not know and could not have known of the true nature and

extent of M.S.'s disabilities until Dr. Ackerson's report in December of 2011, so all of her claims

regarding violations from the end of the Fall semester 2008 onward are timely.  She also claims,

alternatively, that she is entitled to an exception to the statute of limitations, but does not explain

which exception applies and why.

The court does not agree with Lolita S.'s position that she did not know or should not

have known about her claims arising before October 2009 until after she received Dr. Ackerson's

report.  The fact that she filed a request for a due process hearing before even hiring Dr.

Ackerson means she did not need his report to know that serious problems existed with M.S.'s

education program.  If M.S.'s Fall 2008 semester grades served as notice to the school system

that he was not progressing, then those grades similarly served as notice to her. If his failure of

seventh grade served as notice to the school system that his problems were more severe than at first acknowledged, then that failure similarly served as notice to her.  Lolita S. was not a novice to the special education system, having other children who were involved in special education. So, she was or should have been aware of the process of joining the system, including the referral process.  She had access to M.S.'s grades and standardized scores and she also had the benefit of knowing his history, his personality, and his social skills.

Further, Lolita S. has not provided *evidence* that the school system made misrepresentations to her or withheld information from her.  Thus, no exceptions to the statutory bar apply.

In sum, the court finds that Lolita S. has failed to prove the following:  that she did not have notice of the relevant facts to start the statute running; that the statute was tolled; or that an exception to the statute applied.   The court will AFFIRM the hearing Decision on this issue; any claims arising before October of 2009 are barred.

### 4.  Did the District Comply with "Child Find"?

Lolita S. asserts that the district violated Child Find in failing to test M.S. for eligibility for special education services after his Fall 2008 grades and thereafter.   The hearing Decision states that no Child Find violations occurred.  Alternatively, it stated that, because of the two-year statute of limitations measured backwards from the request for due process hearing in October of 2011, claims are barred based on the alleged Child Find violations occurring in 2008 and May 2009.  Further, the hearing officer found that the next time the parent requested services – after the 2009-2010 school year,  the district properly acted on the request.  Lolita S. disagrees with the Decision, claiming that the district's obligation to "find" M.S. and refer him for special education services continued after the initial violations, which occurred at the completion of Fall

53

2008 semester, when M.S. received low grades, and at the end of the 2008-2009 year, when he failed the grade. (Lolita's Br., Doc. 17 at 41).

Although the IDEA does not limit a district Child Find duties to certain times during the academic year, Lolita S. has pointed this court to no statutory language or case law supporting her argument that alleged violations occurring during the statutory bar continue on each day following that violation.  For example, in this case, Lolita S. argues that the violation first occurred at the end of the Fall semester of 2008 and continued each day following, from December of 2008 onward.  Indeed, if that argument succeeded, then no statute of limitations bar would be enforceable, because every violation would continue past the statutory bar.  Rather, the more reasoned approach would be to see what occurred from October 2009 and onward to place the district on notice that M.S. might be disabled and require special education services.

As Lolita S. points out in her briefs, the obligation to identify, locate or evaluate the student pursuant to IDEA falls upon the district, not upon M.S.'s parent.  *See, e.g., Draper,* 518 F.3d at 1288 ("We decline the invitation of the School System to conclude, as a matter of law, that [the student's] family should be blamed for not being experts about learning disabilities."); *Branham v. Gov't of D.C.,* 427 F.3d 7, 8-9 (D.C. Cir. 2005) ("School districts may not ignore disabled students' needs, nor may they await parental demands before providing special instruction."); *see also* 20 U.S.C. § 1412(a)(3)(A) (All children with disabilities ... are [to be] identified, located and evaluated" with no requirement that the parent or someone on behalf of the child request evaluation).    That obligation does not extend to testing every student who is not successful when factors other than a disability would also explain the failure to progress; evaluations are only required when the evidence is sufficient to cause a school system to have a reasonable belief that such an evaluation is necessary.  *Ltr. to Stone Cnty. Sch. Dist.,* 52 IDELR

51 (Offc. Civ. Rights 2008).

During the 2009-2010 year, M.S. repeated seventh grade and received passing grades during the repeat year, although four of his eight grades were Ds.  While those passing grades are certainly not stellar, factors other than a lack of intellectual ability could explain, or partially explain, the bad grades: evidence reflected that he skipped classes, did not come prepared with basic materials for class, did not appear motivated consistently to complete assignments, and often did not complete homework.  Further, teachers' testimony indicated that he did respond to directions accurately; appeared to understand assignments; and when he completed assignments both in class and homework, that work was satisfactory,  for the most part.   Accordingly, the reason for academic failure appeared to be a failure to prepare rather than an inability to learn. *See, e.g.,* R. 507-511, 518, 524, 1009.  In light of that testimony, the hearing officer found that the district did not violate Child Find in failing to evaluate M.S. for special education prior to the summer of 2010.

At the end of the 2009-2010 school year, when Lolita S.  requested an evaluation for special education, the district promptly began the referral and evaluation process, and by the end of September 2010, the district found him eligible for special education.

Based on this testimony, which the hearing officer found credible, the court finds no violation of Child Find, and AFFIRMS the hearing Decision on this issue.

### 5.   Is M.S. Entitled to an Award of Compensatory Education?

Lolita S. argues that because M.S. was denied a FAPE, M.S. is entitled to appropriate compensatory education services.  Having determined that M.S. was denied a FAPE, the court REMANDS this matter to the administrative hearing officer to determine the appropriate amount and type of compensatory education necessary for M.S.

## B.  THE INDEPENDENT EDUCATIONAL EVALUATION ISSUE

The Board appeals the hearing officer's Decision to grant the request for parental reimbursement from the local educational agency for the cost of the evaluation of M.S. by Dr. Ackerson, which Lolita S. characterizes as an Independent Educational Evaluation ("IEE").

The "core" of the IDEA is a "cooperative process ... between parents and schools" to jointly design a student's IEP.  *Schaffer v. Weast,* 546 U.S. 49, 53 (2005).  To protect the informed involvement of the parents in developing the education process for their child, IDEA required the states to provide numerous procedural safeguards, including "an opportunity for the parents of a child with a disability ... to obtain an independent educational evaluation ["IEE"] of the child."  20 U.S.C. § 1415(a)-(b) (2005).  Subsequent regulations have specified that when a parent disagrees with a public agency's evaluation of a student, the "parent has the right to an independent education evaluation at public expense."  34 C.F.R. § 300.502(b)(1); *see also* 45 C.F.R. § 121a.503(b) (1977).

The regulation specifically provides:

§ 300.502(b) Parent right to evaluation at public expense.  (1) A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency, subject to the conditions in paragraphs (b)(2) through (4) of this section.

(2) If a parent requests an independent educational evaluation at public expense, the public agency must, without unnecessary delay, either –
(i) File a due process complaint to request a hearing to show that its evaluation is appropriate; or
(ii) Ensure that an independent educational evaluation is provided a public expense, unless the agency demonstrates in a hearing pursuant to §§ 300.507 through 300.513 that the evaluation obtained by the parent did not meet agency criteria.

(3) If the public agency files a due process complaint notice to request a hearing and the final decision is that the agency's evaluation is appropriate, the parent still has the right to an independent educational evaluation, but not at

public expense.

**(4)** If a parent requests an independent educational evaluation, the public agency may ask for the parent's reason why he or she objects to the public evaluation.  However, the public agency may not require the parent to provide an explanation and may not unreasonably delay either providing the independent educational evaluation at public expense or filing a due process complaint to request a due process hearing to defend the public evaluation.

**(5)** A parent is entitled to only one independent educational evaluation at public expense each time the public agency conducts an evaluation with which the parent disagrees.

**(c) Parent-initiated evaluations.**  If the parent obtains an independent educational evaluation at public expense or shares with the public agency an evaluation obtained at private expense, the results of the evaluation —
(1) Must be considered by the public agency, if it meets agency criteria, in any decision made with respect to the provision of FAPE to the child; and
(2) May be presented by any party as evidence at a hearing on a due process complaint under subpart E of this part regarding that child.

34 C.F.R. § 300.502 (b) & (c).

The Eleventh Circuit has recently determined that this regulation is valid, including the portion of the regulation requiring the Board to request its own hearing to challenge a parent's request for publicly-funded IEE.  *Phillip C. v. Jefferson Cnty Bd. of Educ.,* 701 F.3d 691, 698 (11th Cir. 2012).

The Board argues that the hearing officer's Decision ordering the reimbursement of the cost of Dr. Ackerson's evaluation is due to be reversed (1) because that evaluation was expert testimony as opposed to a true IEE; and (2) because no reimbursement is due under the governing regulation given the hearing officer's finding that the student evaluation was appropriate.

Predictably, Lolita S. disagrees, arguing that Dr. Ackerson's evaluation was a true IEE; and that the school district cannot now refuse to pay for Dr. Ackerson's evaluation because it did

not comply with the IDEA requirement of filing its own due process request to contest reimbursement.

This court FINDS that Lolita S. and counsel are entitled to reimbursement for Dr. Ackerson's services. Lolita S. communicated her request for an IEE at public expense in a letter dated October 13, 2011 and received by the State Superintendent of Education via email on that date or, at the latest, on October 18, 2011. The Board asserts that the request in the October letter did not count as a proper request for IEE reimbursement because it was *pro forma,* failed to identify the proposed evaluator, and failed to identify the specific disagreement with the evaluation. These arguments are unavailing, as no support exists for them in the statute itself or interpreting case law. The statute and supporting regulation only require the parent to communicate a request, and, here, Lolita S.'s attorney clearly communicated that request by letter stating her client is "seeking reimbursement for ... her independent education evaluations...." (R. 1513). The statute/regulation does not require the parent to identify the independent evaluator at the time of the request and specifically provides that "the public agency may *not* require the parent to provide an explanation..." § 300.502(b)(4). Therefore, the October 13, 2011 request was a valid one pursuant to § 300.502(b.

After Lolita S. communicated her request, the Board had these options: to accept the request; to file its own request for a due process hearing to defend its evaluation; or to demonstrate in a hearing that the parent's proposed IEE did not meet agency criteria. As the regulation above provides, if the Board desired to challenge Lolita S.'s right to an IEE at public expense, a procedure existed that the Board *must* follow. That procedure was to file, without unnecessary delay, its own request for a due process hearing to show that its evaluation was appropriate, and thus, no IEE was necessary. But the Board failed to file its own due process

hearing request. Further, it failed to establish at a hearing that the evaluation obtained by the parent did not meet agency criteria. Thus, it did not follow the procedure for challenging the request for an IEE at public expense set forth in 34 CFR § 502(b)(2) (i)-(ii). As the hearing officer correctly found in his Decision, because the Board "chose not to file its own due process request to defend its evaluation of the child or to demonstrate that the neuropsychologist did not follow the agency criteria," the Board "shall reimburse the parent for that evaluation." (R. 1922).

The Board now attempts in an untimely fashion to articulate the challenges that it should have articulated in a due process hearing request and resulting hearing. Even assuming *arguendo* that it could properly do so at this point – and it cannot – the court finds, alternatively, that the challenges are not well taken. Although the Board argues that Dr. Ackerson's IEE is more properly characterized as "expert witness testimony" than an IEE, the court sees no basis for that distinction. The statutory definition of of IEE is "an evaluation conducted by a qualified examiner who is not employed by a public agency responsible for the education of the child in question." 34 C.F.R. § 300.502(a)(3)(i). Dr. Ackerson's IEE falls within that definition; he is not employed by the Board and is a licensed pediatric neuropsychologist who has served, among other positions, as the Director of Pediatric Neuropsychology at UAB from 1998-2009 and as a clinical professor at UAB and the Children's Health System. Further, the Board has not challenged the IEE prepared by Dr. Ackerson as noncompliant with the agency's criteria for examinations set forth in 34 C.F.R. § 300.502(b)(2)(ii).

Further, the Board presents no case law – and the court is aware of none – interpreting the statute to make the distinction between an independent evaluator versus an expert who evaluated the student and who prepares an IEE and testifies about his report at a due process hearing. The court notes that the case of *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,* 548 U.S. 291

(2006), which the Board cited in a footnote but did not discuss, is inapposite. The student's family in *Arlington* did not characterize the consultant as providing an IEE or request reimbursement under § 300.5029(b)(2), but instead requested that the consultant's fee be recovered as "costs" due to prevailing parties under 20 U.S.C. § 1415(i)(3)(B).

Common sense dictates that if a parent is unhappy with his child's IEP, he would expect his independent evaluator not only to evaluate the child but also to testify at any subsequent due process hearing.  Who would want to hire an independent evaluator only willing to write a report but unwilling to stand behind that report at a due process hearing?

For all these reasons, the court finds, as an alternative ruling, that the Dr. Ackerson's IEE is a true IEE compliant with agency requirements and procedures.

The Board also argues that Lolita S. did not timely identify her independent evaluator and submit the proposed IEE in a timely fashion.  A review of the timeline shows the following:

> September 28, 2011 - Date of 2011-2012 IEP
> October 13, 2011 - Date of Request for Due Process Hearing requesting IEE be paid
>      with public funds
> October 18, 2011 - Date State Superintendent of Education received mailed Request
> November 11, 2011 - Board files Answer denying its obligation to pay for IEE but
>      not requesting a due process hearing to challenge the need for an IEE
> November 30, 2011 - Letter from Lolita S.'s counsel to the Board's counsel
>      requesting an IEE at public expense to be completed by Dr. Ackerson and
>      requesting that M.S.'s education records be sent directly to Dr. Ackerson;
>      letter from parent attorney to Dr. Ackerson advising him that the parent has
>      not yet received requested M.S.'s records from the Board
> December 1, 2011 - Date of Evaluation of M.S. by Dr. Ackerson
> December 13-14, 2011; February 2012 & April 23, 2012 - Due Process Hearing

As is clear from this timeline, the Board filed an Answer within twenty-three (mail) to twenty-eight (email) days of receiving Lolita S.'s request, and Lolita S. identified her expert within twenty-one days of the date the Board filed its Answer denying its obligation to pay for an IEE.

So, after the Board took *over* three weeks to respond to Lolita S.'s request for IEE reimbursement with an Answer that did not fully comply with its response obligations, it nevertheless "fusses" at Lolita S. for taking three weeks to identify her evaluator.  The Board is not in a position to complain about the parent's "untimely" actions when the Board – which should be more knowledgeable about procedures and obligations – did not timely comply with its own obligations and when  its noncompliance arguably contributed to delays in hiring an IEE.

In addition to the Board's failure to comply with the requirements of § 300.502(b)(2), the record reflects that the district did not provide copies of M.S.'s records for the IEE upon Lolita's request, and that, in an attempt to expedite matters, she requested that the district send that information directly to Dr. Ackerson.   The timeline reflects that, given these challenges, Lolita S. acted fairly expeditiously with a fast approaching hearing date.  In any event, the Board was in no position to complain about timeliness issues.

The Board further argues that, because Lolita S. initially agreed with M.S.'s 2010-2011 IEP/evaluation by signing that document, she is estopped from receiving a publicly funded IEE. Lolita S. did sign the 2010-2011 IEP under the words "THE FOLLOWING PEOPLE ATTENDED AND PARTICIPATED IN THE MEETING TO DEVELOP THIS IEP."  She did not understand, and, indeed, the IEP does not state that signing the IEP document meant she agreed with it or was waiving all rights to later object.  Only two weeks elapsed between the date of the IEP and the date of her request for a due process hearing and publicly funded IEE, and this letter listed many disagreements with the Board's evaluation of M.S. (R. 1510-1513).  On November 30, 2011, Lolita S.'s attorney reiterated her disagreement with the Board's evaluation. (R. 1804).   The Board points this court to no statutory law, regulations, or controlling case law that would support the Board's argument on this issue, and the court finds that the argument is

not well taken.

Finally, the Board argues that as long as the hearing officer ultimately found that its evaluation of M.S. was appropriate, regardless of who requested the hearing, the Board is not required to reimburse the cost of the IEE.  The Board does not cite controlling law for this proposition, and, indeed, the controlling regulation does not so provide.  *See* 34 C.F.R. § 300.502(b)(2)(ii).

In sum, the court FINDS that Lolita S. requested reimbursement for the cost of Dr. Ackerson's IEE, that the Board did not comply with the regulation's provisions for challenging its liability for that reimbursement, and that the Board cannot challenge that liability at this point. Therefore, the hearing officer's Decision that the Board is liable for Dr. Ackerson's evaluation is due to be AFFIRMED.  Alternatively, the court FINDS that the Board's challenges to Dr. Ackerson's evaluation are not well taken, and the hearing officer's Decision that the Board is liable for Dr. Ackerson's evaluation is due to be AFFIRMED.

## IV. CONCLUSION

For the reasons stated above, the court FINDS as follows:

• The hearing officer's Decision as to the "Appropriate Education" issue is due to be REVERSED and REMANDED as to the areas of reading and transition skills.  In the other areas challenged under this issue, the court FINDS that the Decision is due to be AFFIRMED.

• The hearing officer's Decision as to the "Independent Educational Evaluation" issue is due to be AFFIRMED.

• Lolita S. is entitled to reasonable attorney fees as the prevailing party.  *See* 20 U.S.C. §

1415(i)(3).

The court will enter a separate Order consistent with this Memorandum Opinion.

Dated this 30th day of September, 2013.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE